**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22-cv-20166-KMM

JOHNNY J. WATSON, *et al.*,
     Plaintiff,

v.

UNITED STATES OF AMERICA, *et al.*,
     Defendants.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS CAUSE came before the Court following a bench trial held on May 31, 2023 and June 1, 2023. *See* (ECF Nos. 85, 86); Transcript of Bench Trials (ECF Nos. 100, 101).[1] In this Action, Plaintiff Johnny J. Watson ("Plaintiff") seeks compensation from the United States of America ("United States" or "Defendant") pursuant to the Federal Tort Claims Act ("FTCA") based upon the events surrounding his arrest by U.S. Department of Homeland Security Investigations ("HSI") special agents in Miami, Florida on February 12, 2021. Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel along with the remainder of the record, the Court now enters its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

**I.**     **FINDINGS OF FACT**

    A. Fact Witnesses

The Court heard from several witnesses during the Plaintiff's case in chief, but only three witnesses were present at the incident relevant to this Action: Special Agent Kevin Selent, Special

---

[1] References to the Redacted Bench Trial Transcripts shall be referred to as "T. __" for trial day one, and "T2. __" for trial day two.

Agent Andrea Randou, and Plaintiff.  The Court also examined video of the incident, *see* Section I.B., *infra*, and found that the video corroborated Agent Selent's and Randou's (collectively, "the Agents") recollection of the events.  In contrast, the Court did not find Plaintiff's testimony credible because portions of his testimony (*i.e.*, that the Agents did not provide verbal commands to him) contradicted the Agents' testimonies as well as the video evidence.  Accordingly, based on the evidence and testimony at trial, the Court makes the following findings.

B.  Factual Findings

This Action arises out of injuries that Plaintiff suffered at the hands of HSI Special Agents Andrea Randou and Kevin Selent.  At all times relevant to this Action, Plaintiff was a resident of Florida, and Agents Randou and Selent were HSI employees.  *See* ("Compl.") (ECF No. 23 ¶ 4); ("Pretrial Stip.") (ECF No. 71 ¶ 3).  Agent Selent has been employed as a special agent since 2009.  T. 4:22–25.  Agent Randou has been employed as a special agent for approximately four years.  T2. 48:1–4.  Prior to her career as a special agent, she served in the United States Army for eleven years.  *Id.*  48:7–10.  Both agents underwent training as part of their duties as special agents, including in areas like use of force and firearms handling.  *See* T. 5:18–7:18; T2. 48:15–21, 65:17–66:13.

At the time of the incident, Agents Randou and Selent were partners in the ongoing investigation of elder fraud by mail and wire, which commenced in early 2020.  *See* T. 63:5–19. The suspects under investigation operated Canadian call centers where they would obtain information from elderly individuals across the United States, place phone calls to the elderly individuals erroneously claiming that a family member needed assistance, and then coerce the elderly individuals to pay them money.  *See id.* 64:8–22.

Pursuant to this ongoing investigation, Agents Randou and Selent intercepted a United Parcel Service ("UPS") package that they believed to be part of the elder fraud scheme. *See id.* 65:11–66:5, 67:2–10. Specifically, the package was addressed to a vacant address located at 5305 Red Road, Coral Gables, Florida (the "Residence"), contained $12,000 in cash, was sent from an elderly individual located in Maryland, and was scheduled for overnight delivery. *See* T2. 67:9– 16; Pretrial Stip. ¶¶ 2–3. Agents Randou and Selent applied for a warrant to install a tracking device to place in the package. T. 22:13–16, 68:13–69:4. The Agents planned to supplement the tracking device's geo-location data by conducting physical surveillance of the suspects who picked up the package. *Id.* 69:15–71:10; T2. 49:2–16. The physical surveillance involved more than just Agents Selent and Randou. Pretrial Stip. ¶ 5. The agents led a team of other HSI agents and coordinated with local police officers from the Miami-Dade, Coral Gables, and Doral police departments. *See* T2. 49:2–16. The agents planned to conduct a "controlled delivery" of the package, meaning they intended to surveil and follow the package to its final location to uncover further participants in the elder fraud scheme. *See* T. 18:22–19:1, 68:13–15, 183:13–23.

Prior to the execution of the tracking device warrant, Miami-Dade Police Officer Josue Vales conducted physical surveillance of the Residence from an unmarked vehicle across the street. *Id.* 122:14–18. There, Officer Vales saw a gray Chrysler Voyager ("the Vehicle") parked at the Residence. *Id.* 215:15–23. Officer Vales checked the Vehicle's license plate and discovered that the Vehicle had been rented to Brandon Wimberly. Pretrial Stip. ¶ 7. After relaying this to the other officers assisting with the operation, law enforcement learned that Wimberly had a criminal history including a firearm offense. *Id.*

Around noon on February 12, 2021, a magistrate judge signed the warrant authorizing use of the tracking device, and shortly thereafter, HSI agents installed the tracking device in the

package.  *See* T. 68:20–69:9.  UPS delivered the package to the Residence that same day.  Pretrial Stip. ¶ 8.  Wimberly exited the Vehicle and retrieved the package.  *Id.* ¶ 9.  Once Wimberly retrieved the package, he drove away from the Residence.  *Id.*  Officer Vales had been continuing his surveillance during the retrieval and confirmed that the individual who retrieved the package matched the picture on Wimberly's driver's license.  T. 226:20–227:6, 228:1–3.

At that point, Agents Randou and Selent believed that Wimberly was participating in the elder fraud scheme, but they determined that the best course of action would be to continue surveillance of the Vehicle rather than engage in a high-speed chase.  T2. 97:18–98:13.  Thus, Agents Selent and Randou followed the Vehicle in an unmarked car while simultaneously monitoring the location data from the tracking device.  T. 26:13–16, 77:10–13.  The surveillance demonstrated that the Vehicle initially traveled north on Red Road, but the Vehicle then made multiple erratic turns, often reversing course.  *See id.* 24:3–7, 81:8–11.  The law enforcement officers determined that the Vehicle was engaging in "heat runs," a type of behavior consisting of erratic driving patterns typically used by individuals who have learned they are under surveillance and are seeking to evade law enforcement.  *See id.* 83:17–88:16.  Because the Agents believed Wimberly's "heat runs" were a threat to public safety, the tracking device was unable to provide instantaneous location data, and the Agents believed that their investigation was at risk now that Wimberly may have been aware that he was being followed, the Agents decided to intervene.  *See id.* at 26:10–27:9, T2. 11:9–12:11.  Agent Randou then called the other law enforcement officers and informed them that they intended to stop the Vehicle.  T. 202:16–19, T2. 55:25–56:5.

Once the Agents decided to stop the Vehicle, Agent Selent activated the blue emergency lights and siren.  T. 91:9–92:15.  Immediately thereafter, Wimberly slowed the Vehicle and turned off of Red Road on to Mantua Avenue.  *See id.* 92:19–93:5.  Though the Vehicle initially stopped,

once Agent Selent began to exit his car, Wimberly drove the Vehicle further eastbound on Mantua. *Id.* 93:8–94:5. A few seconds later, the Vehicle slowed and ultimately stopped on the front yard of a residence.[2] *See id.* 97:18–98:18.

Agent Selent then exited his car and gave repeated commands to the occupants of the Vehicle to "not move" and to "put [their] hands up." *See* Clip 2; Pretrial Stip. ¶ 16. Agent Selent approached the driver side of the Vehicle with his weapon drawn. T. 33:12–25. Seconds later, Agent Randou exited the car and approached the passenger side of the Vehicle with her weapon drawn. T2. 59:11–17. Due to the Vehicle's tinted windows, the officers then repositioned themselves so that they could see Wimberly and Plaintiff through the Vehicle's windshield. T. 41:17–22, 103:19–104:12; T2. 60:16–22. According to the Agents, they drew their weapons because the occupants of the Vehicle had previously failed to comply with law enforcement commands, Wimberly had a known violent criminal history, and the incident was rapidly evolving. T. 33:17–25; T2. 59:14–17.

The Agents positioned themselves in front of the Vehicle with weapons drawn. T. 51:20–52:6, 154:5–12. With one hand on the steering wheel, Wimberly turned the Vehicle so that the wheels were facing towards Agent Selent. *See id.* 35:22–36:14, 50:14–17; T2. 85:18–21; *see also* Video. The Vehicle then began making lurching movements in Agent Selent's direction. *See* T. 111:6–8, 145:22–24; T2. 83:3–7; *see also* Video. At this time, the Agents observed Wimberly reach his other hand toward his waistband where he attempted to retrieve a dark object. *See* T.

---

[2] The Vehicle stop was caught on video through three clips originating from various residential recording devices. *See* ("Video") (Ex. D-1). The first clip ("Clip 1") is surveillance footage from 1518 Mantua Avenue, has no audio, and is 26 seconds long. The second clip ("Clip 2") is surveillance footage from 1508 Mantua Avenue and is 14 seconds long. The third and final clip ("Clip 3") is a combination of footage from 1518 Mantua Avenue combined with the surveillance audio from 4810 Alhambra Circle.

107:14–24; T2. 85:5–16.  Agent Selent believed the dark object to be a gun.  *See* T. 107:21–109:1. Thinking it possible that he would be struck by the Vehicle or that Wimberly would fire a weapon at him, Agent Selent fired twenty-two shots at Wimberly, ultimately killing him.  *See id.* 36:15–19, 109:6–13.

At the same time, Agent Randou observed Plaintiff throw himself outside of the passenger side of the Vehicle and position himself with his torso facing the ground.  T2. 62:21–63:13.  Agent Randou repeatedly issued verbal commands to Plaintiff to show his hands.  *See id.* 63:5–19. Plaintiff, who was wrapped in his seatbelt still, did not comply.  *Id.* 91:14–22.  Agent Randou further testified that she did not know if Plaintiff had anything hidden beneath his torso because his hands were not visible.  *Id.* 63:5–64:5.  After shooting and killing Wimberly, Agent Selent made his way to the passenger side of the Vehicle.  *Id.* 64:10–12.  Plaintiff still had not shown his hands and remained face-down.  *Id.* 64:7–9.  Concerned about whether Plaintiff was concealing another firearm tucked underneath him, Agent Selent executed a so-called "hard technique," meaning that Agent Selent kicked Plaintiff in the face to gain compliance.  *Id.* 64:10–12.  After being kicked, Plaintiff showed his hands to the Agents demonstrating that he did not possess any weapon.  *See id.* 89:18–24.

Officer Vales, who had conducted surveillance earlier, then approached the Vehicle.  *See* T. 47:24–48:5, 122:12–21.  Though the driver's side window was partially shattered, he broke the remainder of the window to garner a better view of the Vehicle.  *See id.* 219:1–11.  Following the shooting, Wimberly's body was laying between the passenger seat and driver's seat with both of his hands in the back passenger compartment.  *Id.* 219:12–220:6.  Vales then unlocked the driver-side rear sliding door.  *Id.* 219:23–25.  Upon doing so, Officer Vales found a small gun in Wimberly's hand.  *See id.* 220:9–14.  The gun was later confirmed to be a black Glock 27.40

caliber firearm. *See id.* 220:9–20. An empty gun holster was also found clipped to the inside of Wimberly's shorts. *See* Ex. D-8. Because the van was still in drive, Officer Vales quickly moved to the driver side of the door and placed the Vehicle in park. T. 220:22–221:7; Pretrial Stip. ¶ 18.

Further examination of the Vehicle led to law enforcement finding an extended magazine in the front center console of the minivan. *See* Ex. D-7. Miami-Dade Forensics Laboratory conducted a DNA analysis of the firearm and Wimberly's DNA was the only DNA found on the gun. *See* T2. 165:13–166:13.

Plaintiff was arrested following the incident. T. 120:23–24. As a result of this incident, he suffered a gunshot wound to the shoulder and a laceration on his cheek under his left eye. *Id.* 156:24–158:16. Paramedics arrived shortly after the incident and transported Plaintiff to Kendall Regional Trauma Center. *Id.* 159:10–18. Physical examinations demonstrated that Plaintiff's shoulder was in stable condition and that Plaintiff was not suffering from any medical complications. *See id.*

## II.    CONCLUSIONS OF LAW

Plaintiff brings assault and battery claims pursuant to the FTCA, 28 U.S.C. § 1346(b)(1). The statute provides in part that district courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages. . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* Because Plaintiff's claim stems from the alleged wrongful act by an HSI agent which occurred during the scope of his employment, the Court has jurisdiction over this Action.

Plaintiff's burden is to prove his case by a preponderance of the evidence. *See Am. Marine Tech., Inc. v. M/Y Alchemist*, 526 F. Supp. 3d 1236, 1245 (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir. 1994)). "A preponderance of the evidence means such evidence, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved 'is more likely true than not true.'" *Dalrymple v. United States*, No. 03-20588-CIV-MOORE, 2005 WL 2456213, at *7 (S.D. Fla. May 6, 2005) (citing Eleventh Circuit Pattern Jury Instruction). Thus, the Court weighs all the evidence and determines if Plaintiff has sufficiently proven his case by a preponderance of the evidence.

A. Applicable Law

Under the FTCA, "individuals may sue the United States [which would be liable] to the [same] extent 'a private person would be liable in the law of the place where the act or omission occurred.'" *Gault v. United States*, No. 1:20-cv-123-AW-GRJ, 2021 WL 4099888, at *1 (N.D. Fla. Sept. 9, 2021) (quoting 28 U.S.C. 1346(b)). Since the incident occurred in Florida, the Court analyzes Plaintiff's assault and battery claims pursuant to Florida law.

"Section 784.011(1), Florida Statutes, defines 'assault' as 'an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.'" *Somers v. United States*, 355 So. 3d 887 (Fla. 2022) (quoting Fla. Stat. § 784.011(1)). The statute requires three elements: (1) an intentional, unlawful threat by word or act to do violence to the person of another; (2) an apparent ability to carry out the threat; and (3) creation of a well-founded fear that the violence is imminent. *Id.* Similarly, under Florida law, "[t]he offense of battery occurs when a person: (1) actually and intentionally touches or strikes another person

against the will of the other; or (2) intentionally causes bodily harm to another person." Fla. Stat § 784.03(1)(a).

But before analyzing whether the Agents may be liable for assault or battery, the Court notes that Florida law also provides a defense for law enforcement officers who use force in the effectuation of an arrest. Florida Statute Section 776.05 provides that "[a] law enforcement officer, or any person whom the officer has summoned or directed to assist him or her, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. The officer is justified in the use of any force. . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm when making the arrest." *Id.* Whether the officer's belief that he or she needed to use force was reasonable is determined by the facts of each case. *See Pena v. Marcus*, 715 F. App'x 981, 988 (11th Cir. 2017) (collecting cases). Courts generally presume good faith on behalf of law enforcement conduct. *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).

B. Procedural History and Allegations in the Complaint

As an initial matter, the Court granted two motions for judgment on the pleadings in favor of Defendant, leaving only Plaintiff's assault and battery claim as the subject of this bench trial. *See* ECF Nos. 47, 64. Plaintiff's assault and battery claim is styled as follows:

**COUNT IV – Assault and Battery of Watson Under FTCA Against United States**

82. Plaintiff[] incorporates the above paragraphs 1–49 common to all counts as fully stated herein.

83. Defendant Selent[,] acting in the course and scope of his employment with the United States, *committed an assault and battery when, after killing Wimberly, he came to Watson and kicked him in the face*, as he lay bleeding from wounds to the shoulder.

84. Defendant had no legal justification for such assault and battery as Watson did not pose an immediate threat of serious bodily harm to the agent or any member of the public.

85. Instead, Watson was unarmed, shot in the shoulder and strapped in a seatbelt *when Selent kicked him in the face* for no reason.

86. *Defendant Selent deliberately kicked Watson in the eye socket* without any justification for the use of deadly force.

87. Defendant Selent was angry because he believed Watson was guilty.

88. *Defendant Selent kicked Watson out of anger, intentionally and maliciously, with a deliberate intent to harm Watson.*

89. Defendant Selent's conduct was willful, wanton and without legal justification.

90. Defendant Selent's assault and battery directly and proximately caused Watson's pain and suffering.

91. Accordingly, Defendant Selent is not protected by official immunity[] because he knew his use of deadly force was not reasonable [sic] [and] violated clearly established departmental policy and law.

92. Plaintiff Watson is entitled to damages from the United States Government under the Federal Tort[] Claims Act for the assault committed by Selent in an amount to be determined at the time of trial.

Compl. at 11–12 (emphasis added).  These allegations form the entirety of Plaintiff's assault and battery claims.  *See id.*

A review of Plaintiff's allegations yields the inevitable conclusion that Plaintiff is seeking compensation for assault and battery based solely upon the injuries Plaintiff sustained as a result of Agent Selent's *kick*.[3]  *See id.*  Notably absent from the Complaint is any allegation that an assault or battery occurred when Agent Selent shot his weapon and when Plaintiff suffered a bullet wound in his shoulder.  *See id.*  It is not the Court's job to litigate Plaintiff's claims for him; the Court cannot and will not broaden Plaintiff's claim to encapsulate actions that Plaintiff himself does not allege as the basis for an assault and battery.  Thus, the Court does not consider the shooting as a

---

[3] Plaintiff also does not attribute fault to Agent Randou's conduct in connection with the traffic stop.  *See* T2. 154:22–24.  The Court will therefore not consider her actions insofar as it could result in Defendant's liability.

10

predicate for Plaintiff's claims, but rather, restrains its analysis to the narrow question of whether Agent Selent's kick was an assault and battery for which Plaintiff may be compensated.[4]

C. The United States is not Liable for Assault and Battery

After considering the testimony of the witnesses and the evidence that the Parties presented, the Court finds for the following reasons that Plaintiff has failed to sustain his assault and battery claim by a preponderance of the evidence.

Pursuant to Florida Statute Section 776.05, Agent Selent was justified in his use of force when he kicked Plaintiff. The statute provides that an "officer is justified in the use of any force. . . [w]hich he or she reasonably believes to be necessary to defend himself or herself or another from bodily harm when making the arrest." *Id.* For the reasons explained below, the Court finds that the evidence demonstrated that Agent Selent was responding to a situation in which he credibly testified that he believed his life to be in danger and that his use of force was necessary to respond to an individual who was potentially armed and not complying with the Agents' demands.

Immediately prior to the kick, the Agents approached the Vehicle which had been engaging in "heat runs" and had recently stopped on the front yard of a residence on Mantua Avenue. *See* T. 83:17–88:16, 93:8–94:5. When Agent Selent then positioned himself in front of the Vehicle (which was not in park) with his weapon drawn, Wimberly reached towards his waistband and turned the steering wheel towards Agent Selent. *See id.* 41:17–22, 103:19–104:12; T2. 60:16–22. Agent Selent testified that he believed the "dark object" in Wimberly's waistband was a firearm. *See* T. 107:21–109:1. Evidence later demonstrated that a firearm, which tested positive for Wimberly's DNA, was found in the Vehicle. *See id.* 220:9–20; T2. 165:13–166:14.

---

[4] Because the question is so narrow, much of the evidence has little bearing on the outcome of this case. For example, the Court does not consider whether Agent Selent's actions when he shot into the Vehicle constituted reasonable force or whether it was privileged under Florida law.

11

Further, Wimberly was also found with a gun holster attached to his person. *See* Ex. D-8. Based on the fact that Agent Selent thought he saw Wimberly reach for a firearm, and that the Vehicle began lurching forward towards him, the Court finds that Agent Selent credibly testified that he believed his life was in danger.

Though the Court expresses no opinion as to whether the *shooting* was reasonable, the above factual background provides necessary context as to why Agent Selent kicked Plaintiff. After the shooting where Agent Selent believed his life was in danger, he then ran to the other side of the Vehicle to respond to where Plaintiff had thrown himself from the passenger seat onto the ground with his torso facing downwards and his hands concealed. T2. 62:21–63:13, 63:5–19, 64:10–12. Concerned that Plaintiff too may have been armed, Agent Randou began yelling commands at him to show his hands. *See id.* 63:5–19. Plaintiff did not do so. *Id.* 64:7–9. Given the context of the shooting which had just occurred, and Plaintiff's noncompliance with the Agents' orders, it is reasonable for Agent Selent to believe that Plaintiff was also potentially armed and dangerous.

From there, Agent Selent testified that he believed the appropriate action to garner Plaintiff's compliance and to determine if Plaintiff was armed was to employ the "hard technique" of kicking Plaintiff. *See* T. 40:1–18. He kicked Plaintiff in the face, causing a laceration on his cheek. *See* T2. 156:24–158:16. After being kicked, Plaintiff subsequently showed his hands and the Agents determined he was unarmed. *See id.* 89:18–24.

Based on the factual circumstances of the incident, the Court holds that Agent Selent's actions were objectively reasonable. Given that Agent Selent had been part of the incident wherein he believed his life to be in danger, it is reasonable for him to have believed that a passenger in the Vehicle may also have been armed. Prior to the kick, Agent Selent did not know whether Plaintiff

12

was armed, and Plaintiff did not comply with commands to make his hands visible. *Id.* 91:14–22. Finally, Agent Selent's use of force was limited in that he kicked Plaintiff for the sole purpose of determining whether Plaintiff was armed and dangerous. Under Florida Statute Section 776.05, the Court finds that this use of force was justified because Agent Selent reasonably believed that, under the totality of circumstances, Plaintiff could have been armed and may have posed a threat to himself and Agent Randou. Because the Court finds that Agent Selent's kick was justified under Florida law, Plaintiff cannot prevail on his assault and battery claim.

## III.    CONCLUSION

UPON CONSIDERATION of the trial, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Final Judgment is entered in favor of Defendant. The Clerk of Court is INSTRUCTED to CLOSE this case. All pending motions, if any, are DENIED AS MOOT. The Court will enter Final Judgment by separate document pursuant to Federal Rule of Civil Procedure 58.

DONE AND ORDERED in Chambers at Miami, Florida, this  6th   day of October 2023.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

13